Good morning, Your Honors. May it please the Court, this is Brian Van Vleck on behalf of Robin Anderson and just, you know, I intend to reserve time for Ms. Oxford, who is from the EEOC. Right, she wanted five minutes. Yes, a little more than five minutes and I'll retain the rest for rebuttal if that's possible. So I'm doing the math right. I mean, it's not very complicated math, but I'm intending to talk for about eight minutes and save the rest for Ms. Oxford. I'll try and give you the warning light at seven. How's that? All right, that'll do just fine. Thank you. Now, in this case, the lower court took this away from a jury granting summary judgment in a sexual harassment retaliation case, and I think that the record is clear that there was abundant evidence below from which a jury could have found harassment. The court went wrong in a couple of different areas in its analysis, however, what happened below, and I think this is clear. What it did, first of all, is the lower court really weighed the facts on the issue of severity. What the court did is it said, look, in Brooks, which is a case that it heavily relied upon, it said, look, there was an incident of sexual assault in this case. That was not found to be harassment, and then it looked at Ellison and said, well, there were four unwanted love letters in that case. Brooks doesn't say it's not harassment, it just says that it doesn't convert the workplace into a hostile work environment because of the employer's reaction, and frankly, it would be helpful to me if you and the EEOC and the company could focus upon what did the employer know, when did it know it, and what, if any, action did it take in response to her complaint. I don't think you have to go into detail going into the facts. We've read the record. We understand what happened on the road. Fair enough, and I think that's exactly how I see it as well. Brooks actually has nothing to do with that standard of severity. Read correctly, it's just all about the employer's reaction and what implications that has for vicarious liability basically after the fact, and that's what we know about Brooks. Tell us whether your client disputes that Mr. Stearns tried to call her. So the company says, I think it's Mr., Stearns tried to call her to talk about potential other assignments. I can't tell if she's denying that that happened. She is, she is. We denied that below in the, you know, the separate statement. She's repeatedly said, and there's evidence in the record, she repeatedly said nobody ever called her from CRST. Nobody ever called her. The company said that she never requested, they claim that she never requested a list of female drivers, which contradicts their claim that they sent her one, and also... Is that the list that you produced in Discovery? So from that, may we conclude that she actually did receive the list? It was in the record. I do, no, that was not produced by us in Discovery. No, that was produced by the other side in I think that might have been the facts. I think, I get these confused sometimes too, the facts from the, or the letter from the investigator that purported to say that they had done an investigation and that some kind of remedial action had been undertaken. That letter from Sarah Kersher. Is she saying she didn't get the, I don't know, I guess it was an email. Email with the list of supposedly women's phone numbers? That she disputes. Where does she dispute that she received that? That is disputed, it was disputed in the separate statement, the plaintiff's response to the separate statement below. Can you show me where? Because I didn't really see her dispute that she received it. And I know the evidence, you know, that we cited to, there's certainly evidence in the record which repeatedly said that she never was called or contacted by anybody from the company. I thought the state of the record was that she didn't necessarily dispute that she received it, but that it came without any cover message or any direction. Well, that is correct as well. I mean, she has no record. Does she dispute she received it or that she didn't know what to do with it once she got it because she didn't hear anything further from the company? Well, she disputes that she received it. She has no recollection of that. The trial court said there was no dispute. It was not because she admitted it, but because of technical issues where the trial court said that we didn't cite to the right part of the record in the separate, the opposition to the separate statement. But that testimony was in the record. So is the state of the record before the district court that it was not disputed because you didn't properly cite to the portion of the record, therefore that fact is not in dispute? Is that what the district court thought? I believe that's what they, that's what the order says, that they deemed that, the court deemed that undisputed. Although we, you know, actually it's, I think it's ER 187. It looks to me like, I think it was their alleged undisputed material, fact 96. And we list disputed. You know, we do list disputed. So we're disputing it. And then the citation. Except that what you wrote was disputed to the extent that the company is claiming that they conducted an investigation, which is really a different point than whether she got this email or any of this information. It could have been more artfully worded, you know, but we were clearly disputing it. And it does seem like you have this additional argument that, well, even if she got it, it's incomprehensible. And that perhaps is the more important argument, is that on its face it creates a factual dispute. Because even anyone receiving that document, if you look at it, it's meaningless on its face. But that's not your objection. Your objection went to the completeness of the company's investigation, not its efforts to provide more work to her. That I don't see disputed in that answer. Well, I mean, the two things are linked. I mean, it's certainly part of the remedial measures that would come out of any kind of investigation to supposedly team her with someone different. You know, that would be a natural part of any investigation. She doesn't say that she tried to contact Mr. Stearns to ask for more work. No, I don't believe she specifically alleges that. She repeatedly called the investigator Sarah Kircher. She was told that was the person. In my mind, I think we've got two separate issues here. One is whether or not her work conditions changed as a result of the filing of the complaint. And there's just a dearth of evidence here on both sides as to what efforts, if any, were made to give her more loads or to pair her with female drivers or maybe even another male driver that didn't have the same types of problems Mr. Vektel is alleged to have. I think we have the issue about whether the company's investigation was adequate and whether or not they're liable for that. Right. Well, I think I would agree with you on that. There's a dearth of evidence, and I would say that supports the implication that it just never happened. The only thing… Do you have the burden of proof of producing the evidence, do you not, in order to establish a prima facie claim that a hostile work environment was created and that she was retaliated against for having the audacity to file a written complaint? Yes. And, you know, we did put forward the evidence, her testimony, that no one ever contacted her despite her repeated efforts. I mean, you did a better job of presenting that evidence to us, and maybe we'll give you the benefit of the doubt. But the district court does seem to have a legitimate complaint, I think, about this way that you briefed the disputed facts, where you're citing it to us like a deposition testimony that I didn't see cited in the disputed facts document. So we can look at this and say, oh, there's a disputed fact here, but you made it hard for the district court, I think, didn't you? Well, I mean, I think, you know, the evidence was there, and we – and at best, I mean, that goes – you have to remember, she was not terminated until March 5th. This was – this alleged note, which, again, on its face, and I do believe that if they are going to – and remember, they are the moving – she was terminated for job abandonment and on a record in which there's no communication at all other than this email with the list of, we think, female drivers, and then this letter that she may or may not have received explaining what, if anything, the company had done in response to the complaint. Beyond that, there's nothing, other than the fact that she never reported for work and she didn't contact Mr. Stearns to ask for any work. Well, I mean, it is their – it was their motion and, you know, it was their burden to ultimately – and this mainly goes – I don't believe this really goes so much – this is not critical to the harassment claim necessarily so much as a potential retaliation claim. They claim she was terminated. They cited, as their alleged non-discriminatory business reason, non-protectional reason, that she failed to, quote-unquote, report to work. And – Okay, I guess I better cease now. Let the EEOC have their say for all. Okay. Thank you. Good morning, Your Honors. May it please the Court, my name is Susan Oxford. I represent the EEOC as amicus curiae here. The Federal Rule of Civil Procedure 56A says that the judge cannot grant summary judgment unless the defendant – the material facts are undisputed and the moving party has demonstrated that it is entitled to judgment as a matter of law. So if you look at the parts of the record that you – the Court has been focusing on, CRST alleged in its disputed – its facts allegedly undisputed, number 96 and 99, which are – can be found on ER 187 and 189, that Stearns attempted to contact Anderson without saying anything other than sending her that email, which we've already talked about. If you look at the face of the email – and I could give you the record site for that – gives no instructions whatsoever, even – CRST represents that it's a list of female drivers, but I've looked everywhere. Yeah, I mean, we have the same concern, but the problem is in – I mean, I really sort of feel for the district court here, because if that fact is undisputed that Stearns attempted to contact Anderson, then why shouldn't – why wasn't the district court entitled to accept that as fact? So I would like – so then CRST – that's my point about Rule 56A. CRST relies on Stearns' declaration, paragraph 15, and if you look at that, he never says he tried to call her. So he does say he has an amorphous attempted to contact her, and then the only thing concrete he says there or in the following two paragraphs is that he sent that email, which, as you've recognized. So for the district court to look and find the evidence that would support he actually called her and left messages – But the district court doesn't have to do that in the – where – I mean, the reason that we require parties to file statements of disputed and undisputed facts is so the district court doesn't have to root through the record like a pig hunting for truffles. So if you look at – It's the obligation of the lawyers to point the court to evidence, and that didn't happen here. So I recognize that the narrative that follows disputed at ER 187 is not pertinent, but then if you look at Anderson's declaration, paragraphs 13 to 15, which is cited there, and then, again, if the other pertinent fact, number 99, Anderson never returns Stearns' calls, for which there's no evidence in the record, period, that Stearns ever tried to telephone her. And Anderson responded disputed. Plaintiff repeatedly attempted to contact Kirchner. However, nobody from CRSD ever returned those calls. And, again, cites her declaration. But she didn't say in her declaration that she ever tried to contact Stearns. I mean, that's why I say we've got a dearth of evidence here as to what happened. This case just sort of falls into a void. So we'd like to – because this is a very important point to the EOC, that an employer's response to a harassment complaint should not leave the complainant worse off. And we don't disagree with you as a matter of law. But the question is give us some evidence here where we can safely conclude that the district court erred on summary judgment in not letting a jury address that issue. I'd like to suggest that it's this. The only evidence CRSD puts in the record that they actually reached out to Anderson is the e-mail, which gives no indication that – no instructions, and then the letter, which Anderson also disputes she ever received, that says, if you need help, call me, which she says affirmatively in the record she tried repeatedly to call her and never got response back. And there's nothing that CRSD ever put in the record to show that it's normal procedure or that it instructed Anderson at any time in orientation or any time thereafter that the onus is on her to call her dispatcher. When she got off the truck, she said, I am ready for another assignment. I'll even take that assignment you just tried to send the two of us on. I'll take it, but not – I just won't drive with him. That's the only thing she said, and there's nothing in the record that shows CRSD ever reached out to her to give her any further instructions on what she should do or even that the ball was in her court. Well, the company did everything it could to take care of the vecto problem immediately after this happened. Aren't they entitled to some credit for that? What more did they have to do to correct this situation than what they promptly did? Your Honor, I'm beyond my five minutes. May I answer the question? No, go ahead. Okay. This court has said in Ellison and Fuller that a company's response should not only end that harassment, it should send a message that will prevent future harassment. So it's very significant here that what CRSD did could only be described accurately as a secret response because it tagged Vegtel's name with no females. He didn't know that, and he left Pennsylvania and drove back to California expecting he'd be called in for a meeting. He knew Anderson was upset with him, and we cite and quote from his Qualcomm communications to the company saying, I know Robin doesn't want to – she's mad at me. She doesn't want to drive with me anymore. I'll take my stuff off the truck, and I'll go home, and I'll wait for that meeting. And is it your position that under the Brooks case, Anderson needed to understand that the company was taking steps and that they haven't shown that they took the steps that Brooks requires? Absolutely. That's the other piece of it. So Vegtel needed to understand two things. One, that the company was not happy with his conduct, and they can't say it's because they didn't know if it's true because they never – the record would suggest they never asked him or a jury could find. He needed to understand, and he needed to know what remedy they were taking against him, and Anderson needed to know what remedy they were taking against him. Or even assuming she had gone back to work, she would never know that CRST took this seriously and was prepared to protect her. Okay. Thank you very much. Thank you. All right. Let's hear from the company. Good morning. May it please the Court. My name is Christopher Eckert. I represent the CRST defendants. I plan to use 10 minutes of our time before I hand it over to Mr. Anderton. Your Honor, the first question you asked was what did the company know, when did it know it, and what did it do? Plaintiff submitted a statement, and that statement is set forth at ER 635 through 638. Plaintiff submitted that statement on January 7th. In that statement, plaintiff set forth her exhaustive list of what she claimed happened. There's a story about hurting down there in a reference to Viagra. There's a story about working in the porn industry and women with large breasts. We've read all that, counsel, but what did your client do upon receipt? The record is silent. The only thing it did was it entered into its computer a notation to the fleet managers, don't pair this guy with female drivers. It sent her a list, which is almost the email is almost incomprehensible, as to what she was supposed to do with the list. And then it says it sent her a letter essentially telling her the investigation had been closed out. But the documents produced in discovery don't corroborate that any investigation was done at all. Well, what we do know is that there was the form opened up. But the form is blank. It provides statements for witness interviews and, you know, what did the offending employee say and so on, and there's nothing there. As soon as the supervisor here, Mr. Stearns, was made aware of any kind of whatsoever, and that was the initial text message sent on January 4th. It's a Qualcomm message, but for ease I'll say text message. He immediately brought the drivers back to California. The drivers were separated. The company made it impossible for not only Mr. Vectel to work with another female, but also impossible for Ms. Anderson to be subject to the harassment she claimed she had been subject to. How did Anderson know that? She didn't. So you acknowledge she had no way to know that those steps were taken? Pardon? She didn't know that he had been prevented from driving with female drivers on a going forward basis. And isn't that important, that she know that some step is being taken to prevent this kind of harassment? In this case, Your Honor, I don't think so, and it's this reason. We've got a unique situation where the work environment essentially is the inside of a truck, and as soon as the company's made aware of the problem, they gave the plaintiff the opportunity for an entire new work environment. How did she know they gave her the opportunity for a new work environment? Well, Mr. Stearns, in his declaration, said he tried to pair the plaintiff with another co-driver. Did she know that? Did she know that she had received the email? Well, okay, let's assume it's uncontested that she received that email. How can we tell from that email what it meant? Only by Mr. Stearns' declaration, which says he tried to pair the plaintiff. But it doesn't say that he told her that or that he explained what the email meant or what she was supposed to do with it. Correct, and I agree the email itself is not clear whether those drivers are male or female either. But the record is clear that below we told the district court in our statement, we attempted to match her with co-drivers. We cited Mr. Stearns' declaration, which said, I tried to pair her with other co-drivers by sending her an email that listed other co-drivers. And the plaintiff did not dispute that fact, other than citing her own declaration, which did not address that fact one way or the other. So that's an abusive discretion standard. Well, but if the only evidence you're pointing to to say that you gave an appropriate response to this situation was something totally incoherent and meaningless, then she did dispute it. She didn't give a perfect answer. We could criticize her counsel for that. But you still are left with no evidence of any action. That's not true, respectfully, Your Honor. We did make it impossible for her work environment to include Mr. Brechtel on a going-forward basis. But she didn't know that, right? So isn't it important that under Brooks, isn't part of the analysis of whether this harassment could be expected to continue, whether the harassed individual knows that some steps have been taken and that the employer has responded? I think under Brooks the question is whether a reasonable person in the plaintiff's position would think that the sexual harassment had become a permanent feature of the employee. And what about what happened to Ms. Anderson would make a reasonable person know that it wasn't going to continue? Had she responded to the email or had she reached out to Stearns to get another co-driver or had she simply taken her own effort to find another? She said she was calling the company. She said she was calling Kircher, who I think she understood to be the person to deal with sexual harassment, called her repeatedly and never got a response. So it's not like she was making no effort to reach out and ask what do I do next or what's happening. But she was contacting HR about the status of her complaint. She was not contacting her supervisor, who was responsible for getting work. The driver's got to contact the supervisor. The HR doesn't give out work. Her claim to the trial court in here is that- Where is the evidence that says that the company's policy was clear, that it was her responsibility to contact the supervisor to ask for another- I apologize. Sorry to interrupt. No, you probably knew what I was going to say. So where is the evidence that she had to ask him for the next job? I need to double-check the driver handbook. I believe that's in the record. I think it's laid out in the driver handbook. If I could submit a supplemental. Do you want to do that when you sit down while your co-counsel is at the lectern? I will. Okay. So, again, judging Searcy's response, you have to look at what Searcy knew and when it knew it and what it did. And importantly, they make a lot of the fact that we didn't interview anybody, but there's no rule in the cases that you have to interview witnesses. And when you look at that statement, it's very interesting. The two examples of Mr. Bechtel making inappropriate comments were on that very first trip. The only other reference to something inappropriate happening was a description of her waking up in the middle of the night with him on the side of his bed, naked, and then getting dressed and then saying, I had an accident. And so from HR's view, from the company's view, those are the only allegations that are made. It seems like you're trying to have it both ways, though. Now you're arguing there was no problem at all. Before you were arguing we took care of the problem. Which one is your position? I don't think it's really both, and I don't think that's inconsistent, Your Honor, because first you judge what do we know and then was our response reasonable? In light of what we were made aware of, given that there's only two offhand comments and then an event where the driver had an accident and was changing his clothes. Couldn't a jury hear the evidence and decide, we think this is a pretty inappropriate environment? So you might argue otherwise, and maybe the jury could decide they agree with you, this isn't so bad, but isn't it possible that a jury could say a reasonable woman in this situation would have felt very uncomfortable? Uncomfortable, sure. I don't think the standard of the case law is uncomfortable. It's got to be extreme. An extremely hostile environment that would prevent her from being able to do her job in the truck with this man. Again, based on the cases decided by the Ninth Circuit, I think this case, even if those facts were true, do not create the type of hostile, abusive environment that would make Searcy liable. Even over a two-week period? The problem here is it seems to me that you're characterizing this as a single incident, but it's a series of incidents as they're driving together across the country in the long-haul truck. That's one of the points from the statement, which is there's two comments on the first trip and then nothing happens until the hotel incident. And if you compare this case to Westendorf, which was a 2013 case from this court, which also said that the test is a permanent feature of your employment, there were comments, unlike here, that were directed to the plaintiff about the plaintiff. You know, the cases that say there's a tribal issue of fact, there's direct solicitation of sex. Counsel, one of the problems I have with the evidence to the extent it exists at all is that when they got to Pennsylvania and the truck broke down, Mr. Stern said, I'm not going to authorize reimbursement for more than one motel room, but there was another male truck driver who was staying at the same motel, and when she suggested to Vectel that he go room with the male truck driver, Vectel refused. I mean, it seems to me that the company sort of set itself up for exactly this kind of a claim by being a little too stingy on paying for a motel room. To answer your response, Your Honor, I have to go a little bit outside the record because this argument wasn't made. Well, before you do that, you've burned up all but five and a half minutes of your time, so if Mr. Vectel's the lawyer. I've got 30 seconds left because he's going to use five minutes. So the fact is that that driver was a Sears T. Malone driver. He's an independent contractor, owner-operator, subject to different rules. We can't control who he sleeps with. Well, so you could have still gotten two rooms. I mean, it didn't have to be that guy's room. But, I mean, when a woman says, I'm going to be forced to share a hotel room with this man, and you say, no, you've got to share a hotel room, you're walking into a not great situation. Hornbook law says an employer can only be liable of that which is made aware or should be reasonably aware. There's no indication in the record that Sears T. had any notice that there were any issues on that truck. That's the issue. My only concern is that this whole case could have been avoided with an $80 motel bill. That is perplexing as a practical matter. But this pair does spend, they had slept in the truck together at the same time. It's kind of a unique nature of this business. No, no, I understand. But that's not a Title VII liability issue. And if I may sit down. Yeah. Thank you, Your Honor. Good morning, Your Honors. Chad Anderton on behalf of Defendant Eric Vektil. Your Honors, I can keep this very brief. I mean, my plan was to just address the extraterritorial application of California law. There I think the record's very clear. We've cited to two California Supreme Court cases, Alaska Salmon and also the Diamond case, that are very clear that when you're looking at this issue, you look at where the conduct, the alleged unlawful conduct occurred. And in this case, I would ask the court to look, of course, with Vektil, the only unlawful alleged conduct is the alleged harassment, of course. He's not involved in the decision as to any alleged termination. And it's completely undisputed that all of the alleged harassment occurred outside the state of California. So in addition to that, Your Honors, I would also argue that plaintiff did not raise the issue of extraterritorial application of California law as it pertains to Vektil. At page two of their brief, in issues presented, the only issue presented as to California FEHA, it's issue number four, just quoting from their brief, whether an employment relationship between a California resident and a trucking company that does business in California should be governed by California anti-discrimination law, the FEHA, where the employment relationship is formed in California is based out of California and includes substantial work within California. So they're not even raising the issue. Do you have a position on that question? Well, Your Honor, I would have to defer to my colleague, Mr. Eckhart, on that. I don't want to step on toes on that. Certainly, I would have an opinion, but I don't view it as my place. Okay. Do you want to let him back up so he can give his testification? Yes, Your Honor. Thank you. I apologize. I didn't hear the last question because I was looking. Well, so the last question is whether the omissions of your client could lead to FEHA liability because omissions or other acts that touched on California or could have happened in California are enough to give liability. His client didn't do anything in California, but your client at least had omissions in California. I understand. Our position there is that the allegedly illegal behavior, which is the decision to terminate the employment, occurred in Iowa so that the illegal behavior and the underlying conduct also occurred outside of the state. Was she hired in California? She was hired in California. We're based in… So if she was hired in California, how is the termination not in California too? I mean, her employment essentially originated in California, so it ended in California? Well, it is a closer call, but you're looking at two things, both the decision and also where the plaintiff works. I think why it's in our favor in this case, her employment really was all over the country. There really were very limited – there was a limited amount of work done in California, but the decision, according to the plaintiff, was made… Did anything in her employment contract or employment papers say that her employment would be governed by the laws of a state other than California? She didn't have an employment contract, so no. The answer is no. And the employee handbook doesn't say anything about that? I don't know the answer. I quickly – when I quickly reviewed, I didn't see a copy of the driver handbook in the excerpts. But she worked out of the Fontana hub? Correct. Correct. And so you couldn't find the employee handbook to tell us the answer to the other question either, about whose responsibility it is to ask for a next trip? That's correct. I didn't see it in the excerpts. That's not an issue that was raised below, so I'm not sure if we put it in the district court's record or not, but it's certainly – I didn't see it in the record that I just checked. If I may quickly just ask that the court affirm the district court's judgment. Thank you very much. Thank you very much. I'll give you two minutes on rebuttal. Try to be very fast. I do think it was touched on what more could the company have done. And the failure to investigate is more than just getting the facts. It's sending a message, and Fuller was very, very clear on this. For instance, we asked, like, what did the plaintiff know? Well, one thing she knew is that she was reaching out – they never interviewed her. I mean, when you have a claim of harassment, the obvious first step to send a message that anything is being done is to interview the complainant. It was suggested, I think, from the other side that somehow maybe her complaints weren't completely exhaustive or fulsome. Well, that's what the investigation is supposed to bring out. She complained about everything she was asked to complain about, put in a written complaint, and everything else would have come out if they had followed through. And this – Do you pretend that had she been interviewed, she would have added additional material facts that were not otherwise set forth in her five-page written statement? You know, it would depend, of course, what's considered material, but she certainly would have given more detail. I mean, she hand-wrote five pages as much as she could. I mean, obviously – Which is pretty detailed. It is. It's very detailed. And on the basis of that written complaint, the company did, at least internally, prevent him from working with female drivers. That was my other point. I don't think they get credit for that because, first of all, it was mentioned that they somehow prevented him from working with her. In fact, that's not true. Didn't you depose him? Yes. And has he ever driven with another female driver? Not at that time, no. No. And it was, you know, I think a year or more later when it even – You don't think the company gets any credit for that at all? Well, not vis-a-vis this case because it was – she removed – the plaintiff in this case, Robin Anderson, removed herself from this hostile workplace through self-help. When he got back, she got out of the truck and just got out of there. And so for them to say, oh, we took remedial measures to keep them apart, no, they didn't. She did that herself. And when they tagged him like that – Do we have any idea how likely it would have been for him to drive with another female driver anyway? How likely? Yeah, like, I mean, was she the first female driver he'd ever driven with in the first place? He said no. Actually, he said that he had had some problems in the past. And I can say that the – and I don't know if this was part of the record, but it's approximately 5 percent or less of the workforce is female, so you can do the math. 3,000 drivers or something. Something like that, yeah. So just by happenstance, he wasn't that likely to be paired up with a female driver in any event. And, you know, that can frankly be looked at more of the company's self-protection. You know, they didn't punish him. They just said, well, if he's a danger, we'll protect the company from liability by just not pairing him with a woman. The other thing mentioned in Fuller is that doing a fact investigation, you know, even separate and apart from what the company might do to act on those facts, is an important corrective action itself because it sends a message to other would-be harassers, the company takes it seriously, enough to even bring them in for an interview and get the actual facts. I mean, when the company won't even be bothered to get the actual facts from either the accuser or the accused, it just tells the whole workforce they don't care. They just, you know, they just kept the individual out there knowing or hoping, at least the jury could infer that, that she would just get tired of not having any income and just go away. That's certainly an inference. Counsel, your time has run up. Okay. All right. Thank you very much. Okay. Very well. The case just argued is submitted and we'll now hear argument in Dominic Hardy.
judges: Tallman, Friedland, Faber